IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

BMO HARRIS BANK, N.A.
111 West Monroe Street
Chicago, IL  60603,

        Plaintiff,

  v.

McM, INC.                        Case No. _____
14854 82nd Street N.E.
St. Thomas, North Dakota 58276,

and

RONALD G. McMARTIN, JR.
14854 82nd Street N.E.
St. Thomas, North Dakota 58276,

        Defendants.

## COMPLAINT

Plaintiff, BMO Harris Bank N.A., for its causes of action against the defendants, McM,

Inc. and Ronald G. McMartin, Jr., alleges the following:

### NATURE OF THE CASE

1.    Defendant Ronald G. McMartin, Jr. is the sole owner and officer of defendant

McM, Inc., a large-scale farming operation in North Dakota with leased land stretching across

North Dakota and into Minnesota, including the length of the Red River Valley, from Canada to

the South Dakota border.  McM has farmed as many as 50,000 acres, and has also provided

"custom hire" services to related parties.  McM produces crops including red potatoes, corn,

wheat, soybeans, edible dry beans and sugar beets.  In addition, the company operates a small

cattle operation, and grows hay and alfalfa for cattle feed.

2.     McM borrowed $43 million from the Bank.  McM and McMartin Jr. convinced the Bank to extend or continue these loans by providing false financial statements to the Bank.  They also failed to comply with the terms of the loan documents, and converted loan proceeds and collateral for purposes not permitted by their contracts with the Bank or applicable law.  This is an action (a) for judgment on the obligations due the Bank by McM and by McMartin Jr.; (b) for judgment against McM and McMartin Jr. for their fraud, deceit and conversion; (c) for replevin of collateral pledged by McM and McMartin Jr.  to support their obligations to the Bank; and (d) for appointment of a receiver to locate, assemble and liquidate the Bank's collateral.

JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00 exclusive of interest and costs, and is between citizens of different states.

4.     Venue is proper pursuant because Defendants expressly consented in the Loan Documents (as defined below) to venue in this District and the application of Minnesota law.

PARTIES TO THE ACTION

5.     BMO Harris Bank N.A. (*"Bank"* or *"BMO"* or *"Plaintiff"*) is a national banking association with its primary office located at 111 West Monroe Street, Chicago, Illinois 60603. BMO is a citizen of the state of Illinois.

6.     Defendant McM, Inc. (*"McM"* or *"Borrower"* or *"Defendant"*) is a North Dakota corporation with a principal place of business located at 14854 82nd Street N.E., St. Thomas, North Dakota 58276.  McM has operations in at least (a) the following North Dakota counties: Pembina, Walsh, Traill, Grand Forks, Towner, and Steele, and (b) the following Minnesota counties: Polk, Cass and Clay.  McM is a citizen of the state of North Dakota.

7.    Defendant Ronald G. McMartin, Jr. (*"McMartin Jr."* or *"Guarantor"* or *"Defendant"*) is an adult citizen of North Dakota, with an address of 14854 82nd Street N.E., St. Thomas, North Dakota 58276.  McMartin is a citizen of the state of North Dakota.

THE MCM LOANS, COLLATERAL AND GUARANTY

8.    The Bank and McM are parties to a Master Loan Agreement dated as of July 31, 2012 pursuant to which the Bank extended credit to McM (the "*Master Loan Agre*ement").  A copy of the Master Loan Agreement is attached hereto and incorporated herein by reference as **Exhibit 1**.

9.    Under the Master Loan Agreement, the Bank extended a $25 million revolving line of credit in 2012 to McM for crop inputs and working capital.

10.    The Bank and McM amended the Master Loan Agreement pursuant to the First Amendment to Master Loan Agreement effective as of May 14, 2013 (the *"First Amendment"*). A copy of the First Amendment is attached hereto and incorporated herein by reference as **Exhibit 2**.

11.    Pursuant to the First Amendment and at McM's request, the Bank increased the revolving line of credit from $25 million to $31 million, and established an additional revolving line of credit of $1.5 million to finance hedging accounts (the *"Hedge Line"*).

12.    The Bank and McM amended the Master Loan Agreement pursuant to the Second Amendment to Master Loan Agreement effective as of April 30, 2014 (the "*Second Amendment*").  A copy of the Second Amendment is attached hereto and incorporated herein by reference as **Exhibit 3**.

13.    Pursuant to the Second Amendment and at McM's request, the Bank increased the revolving line of credit from $31 million to $36 million for a time, with an eventual reduction to $32 million, and extended the maturity (due date) of the loan.  In addition, and at McM's request,

the Bank increased the Hedge Line from $1.5 million to $4 million, and extended the maturity (due date) of that loan.

14.    The Bank and McM amended the Master Loan Agreement pursuant to the Third Amendment to Master Loan Agreement effective as of April 13, 2015 (the *"Third Amendment"*). A copy of the Third Amendment is attached hereto and incorporated herein by reference as **Exhibit 4**.

15.    Pursuant to the Third Amendment and at McM's request, the Bank made another revolving line of credit available to McM in the initial amount of $8 million (the *"Short Term Line"*).  In addition, and at McM's request, the Bank (among other things) decreased the Hedge Line from $4 million back to $1.5 million.

16.    The Bank and McM amended the Master Loan Agreement pursuant to the Fourth Amendment to Master Loan Agreement effective as of April 22, 2016 (the *"Fourth Amendment"*).  A copy of the Fourth Amendment is attached hereto and incorporated herein by reference as **Exhibit 5**.

17.    Pursuant to the Fourth Amendment and at McM's request, the Bank made a nonrevolving line of credit available to McM in the amount of $8 million to fund input costs and operating expenses for the 2016 crop year (the *"2016 Input Loan"*).

18.    The Bank and McM amended the Master Loan Agreement pursuant to the Fifth Amendment to Master Loan Agreement effective as of June 20, 2016 (the *"Fifth Amendment,"* and together with the First Amendment, the Second Amendment, the Third Amendment and the Fourth Amendment, the Amendments).  A copy of the Fifth Amendment is attached hereto and incorporated herein by reference as **Exhibit 6**.  The Master Loan Agreement, together with the First Amendment, the Second Amendment, the Third Amendment, the Fourth Amendment and the Fifth Amendment, are collectively referred to herein as the *"Loan Agreement."*

19.     Pursuant to the Fifth Amendment and at McM's request, the Bank increased the Hedge Line from $1.5 million to $2 million, and increased the 2016 Input Loan from $8 million to $9 million, to replenish operating funds used to cover margin calls and to fund input costs and operating expenses for the 2016 crop year.

20.     When the Fifth Amendment became effective on June 20, 2016, the following loans had been made available by the Bank and were outstanding to McM:

  (a) $32 million Revolving Line of Credit;

  (b) $2 million Hedge Line; and

  (c) $9 million 2016 Input Loan.

21.     The Revolving Line of Credit is further evidenced by a First Modified Revolving Line of Credit Note dated as of April 30, 2014 and the Replacement Allonge to First Modified Revolving Line of Credit Note (Revolver) dated as of April 22, 2016 (collectively, the *"Revolving Line of Credit Note"*).   Copies of these documents are attached hereto and incorporated herein by reference as **Exhibit 7**.

22.     The Hedge Line is further evidenced by a First Modified Revolving Line of Credit Note (Hedging) dated as of April 13, 2015, a Replacement Allonge to First Modified Revolving Line of Credit Note (Hedging) dated as of April 22, 2016 and a Second Allonge to First Modified Revolving Line of Credit Note (Hedging) dated as of June 20, 2016 (collectively, the *"Hedge Line Note"*).  Copies of these documents are attached hereto and incorporated herein by reference as **Exhibit 8**.

23.     The 2016 Input Loan is further evidenced by a Non-Revolving Note dated as of April 22, 2016, and Allonge to Non-Revolving Line of Credit Note dated as of June 20, 2016 (collectively, the *"Non-Revolving Note"*).   Copies of these documents are attached hereto and

incorporated herein by reference as **Exhibit 9**.  The Revolving Line of Credit Note, the Hedge Line Note and the Non-Revolving Note are referred to collectively as the *"Notes."*

24.    To induce the Bank to extend the credit described above, and to secure the obligations of borrower McM, McM granted the Bank a security interest in all of its personal property, as more fully described in the Security Agreement dated as of July 31, 2012 (the "*Security Agreement*"), a copy of which is attached hereto and incorporated herein by reference as **Exhibit 10**.

25.    Included in the pledged assets are McM's interest in various partnerships, limited partnerships, joint ventures and other entities or business arrangements growing sugar beets for sale to American Crystal Sugar Company (collectively, the *"Beet Partnerships"*), including but not limited to: (a) McMartin – LN Limited Partnership, (b) McMartin – MN Limited Partnership, (c) McM, Inc. Limited Partnership III, (d) McM, Inc. Limited Partnership XV, (e) MCM, Inc. Limited Partnership XI, (f) McM, Inc. and Pyle Farms, Inc. Joint Venture, (g) McM, Inc. Limited Partnership XIV, (h) McM Limited Partnership XVII, (i) McM-Davis Joint Venture, (j) McM-Van Camp Joint Venture, (k) Jacaranda Limited Partnership, (l) McM, Inc. – FMH Co., (m) McM, Inc. Sugar Beet Limited Partnership I, (n) McM, Inc. Limited Partnership V, (o) McM, Inc. J.V. James M Guy and Jane M. Guy, (p) GM-KW Limited Partnership, (q) Gail McMartin Farms Limited Partnership I, (r) Gail McMartin Farm LLLP III and (s) Gail McMartin – McM Inc. Joint Venture.  The interests pledged included the unit retains for shares in American Crystal Sugar Company.

26.    The Bank perfected its interests in the McM personal property collateral by filing (a) a UCC Financing Statement with the North Dakota Secretary of State on August 1, 2012 as document number 12-000763463-0, a copy of which is attached hereto and incorporated herein by reference as **Exhibit 11**, (b) a UCC Financing Statement with the Minnesota Secretary of

State on August 1, 2012 as document number 201229134110, a copy of which is attached hereto and incorporated herein by reference as **Exhibit 12**, (c) a farm products central notice filing financing statement with the North Dakota Secretary of State on July 22, 2016 as document number 16-000077497-1, a copy of which is attached hereto and incorporated herein by reference as **Exhibit 13**, (d) a farm products central notice filing financing statement with the North Dakota Secretary of State on August 2, 2016  as document number 16-000081990-0, a copy of which is attached hereto and incorporated herein by reference as **Exhibit 14**, and (e) a farm products central notice filing financing statement with the Minnesota Secretary of State on August 3, 2016 as document number 89728990037, a copy of which is attached hereto and incorporated herein by reference as **Exhibit 15**.

27.    The Bank perfected its interest in the McM vehicles by recording its lien in the office of the North Dakota Department of Transportation and now holds title to the vehicles described on **Exhibit 16** attached hereto and incorporated herein by reference

28.    To induce the Bank to extend the credit described above, and to secure the obligations of borrower McM, McM also provided the Bank with assignments of crop insurance (the "*Crop Insurance Assignments*).

29.    To induce the Bank to extend the credit described above, and to secure the obligations of borrower McM, related party Border Beets Limited Partnership granted the Bank a security interest in its assets, including its crops and 293 shares of preferred stock of American Crystal Sugar Company, including its unit retains in those shares, acknowledged and agreed to by American Crystal Sugar Company.

30.    To induce the Bank to extend the credit described above, McMartin Jr. executed and delivered to the Bank a Guaranty dated July 31, 2012 (the "*McMartin Jr. Guaranty*"), a copy of which is attached hereto and incorporated herein by reference as **Exhibit 17**.

31.    McMartin Jr. acknowledged and confirmed his guaranty in Acknowledgements executed and delivered by him to the Bank dated April 30, 2014 and April 22, 2016, copies of which are attached hereto and incorporated herein by reference as **Exhibit 18**.

32.    To induce the Bank to extend the credit described above, and to secure the obligations of borrower McM and guarantor McMartin Jr. to BMO, McMartin Jr. granted the Bank a security interest in all of his personal property, as more fully described in the Security Agreement dated as of July 31, 2012 and Addendum dated as of April 30, 2014 (together, the "*McMartin Jr. Security Agreement*"), copies of which are attached hereto and incorporated herein by reference as **Exhibit 19**.

33.    The Bank perfected its interest in the McMartin Jr. personal property collateral by filing a UCC Financing Statement with the North Dakota Secretary of State on August 1, 2012 as document number 12-000763466-3, a copy of which is attached hereto and incorporated herein by reference as **Exhibit 21**.

34.    The Loan Agreement, the Notes, the Security Agreement, the McMartin Guaranty, the McMartin Jr. Security Agreement, the Crop Insurance Assignments, UCC financing statements, and other documents delivered pursuant to or in connection with the Loan Agreement are referred to herein as the *"Loan Documents."*

35.    The assets of McM in which McM granted the Bank a security interest are referred to herein as the *"McM Collateral."*  The assets in which Border Beets granted the Bank a security interest are referred to as the *"Border Beets Collateral."*  The assets in which McMartin Jr. granted the Bank a security interest are referred to as the *"McMartin Jr. Collateral"* (together with the McM Collateral and the Border Beets Collateral, the *"Collateral"*).

36.    All obligations owed by McM and McMartin Jr. under the Loan Documents are secured by valid, continuing and properly perfected first-priority security interests and liens granted by McM and McMartin Jr. in their personal property.

**FRAUDULENT MISREPRESENTATIONS AND OMISSIONS OF DEFENDANTS**

37.    To induce the Bank to enter into the Fourth Amendment, McM and McMartin Jr. provided the Bank with draft and final financial statements for McM's fiscal year ending December 31, 2015 prepared by McM's accounting firm on the basis of information provided by McM (the *"FYE 2015 Financial Statements"*) and received by the Bank on February 18, 2016 and March 23, 2016, respectively.

38.    In the FYE 2015 Financial Statements, Defendants (through McMartin Jr.) represented to the Bank total accounts payable of $24,660 and accrued liabilities of $204,116. The FYE 2015 Financial Statements also showed $3,390,834 as "Investment in Future Crop" for seed, chemicals and fertilizer.

39.    Defendants' representations in the FYE 2015 Financial Statements were false.  In fact, McM had obligations for 2015 crop inputs, harvesting or processing expenses of at least $3,000,000.00, including amounts owed to creditors CPS and Columbia Grain.  The FYE 2015 Financial Statements were also fraudulent because McM misrepresented the value of crop inventories.

40.    To induce the Bank to enter into the Fourth Amendment, Defendants (through or directed by McMartin Jr.) also provided the Bank with cash flow budgets, and comparisons of actual to budgeted cash flows, in February, March and April, 2016.

41.    The March 2016 cash flow budget purportedly setting forth projected 2016 revenues as well as expenses for crop inputs, harvest and storage, was represented to be based upon McM planting 38,761 acres (per an email from McMartin Jr. to the Bank) to make it look as though the

cost per acre was reasonable and that McM was reasonably expecting certain revenues to be paid as a result of sales of its 2015 potatoes.

42.    Defendants' representations in and regarding the cash flow budgets delivered to BMO in February, March and April 2016 were false.  Defendants significantly overstated expected revenues, and failed to advise BMO that McM was farming for McM only approximately 29,087 acres in 2016, making its budget (and loan request) overinflated for the anticipated expenses to plant, harvest and process that amount of acreage.

43.    Contrary to a spreadsheet prepared and delivered by McMartin Jr. to the Bank showing 38,761 "McM Inc. 2016 insurance guarantees by crop", more than 9,451 of those acres were in fact crops subsequently reported to be subsequently reported to be owned by Ronald G. McMartin, Sr., the father of guarantor defendant McMartin, Jr. (*"McMartin Sr."* or *"Sr."*), through the McMartin Ronald Sr. & Bonita JV.

44.    To induce the Bank to enter into the Fifth Amendment, McM and McMartin Jr. provided the Bank on May 12, 2016 with financial statements for McM as of March 31, 2016.

45.    Those financial statements for McM as of March 31, 2016 contained misrepresentations, including overstatement of receivables due for potato inventory and overstatement in the "investment in growing crop".

46.    To induce the Bank to enter into the Fifth Amendment, on June 17, 2016, Defendants (through or directed by McMartin Jr.) provided the Bank with a cash flow budget to actual comparison through May, 2016.  Once again, revenues were significantly overstated, and Defendants failed to advise BMO that McM had planted significantly less acreage than the budget assumes, making its budget (and loan request) overinflated for the expenses that should have been necessary for the 2016 crop.

47.   Among other things, the financial information supplied by Defendants falsely, intentionally and significantly overstated accounts receivable and inventory by at least $11 million.

48.   Notwithstanding McM's contractual obligation to use the proceeds of the 2016 Input Loan for input costs and operating expenses of the 2016 crop year, McM (through or directed by McMartin Jr.) used at least $3 million of the proceeds to pay other expenses instead.

49.   McM and McMartin Jr. intentionally kept from the Bank the fact that they were using 2016 Input Loan proceeds for improper purposes in violation of the provisions of the Loan Documents.  They did so even as they asked for yet another $1.5 million loan in connection with the Fifth Amendment.

50.   As a result of McM's misuse of loan proceeds (all through or as directed by McMartin Jr.), McM sought additional input financing from other vendors and lenders.  As a result, BMO's Collateral may now be charged with additional liens and encumbrances, all in violation of McM's promises and commitments to BMO under the Loan Documents, and all to BMO's detriment.

51.   McM performed custom farm work in 2016 for McMartin Sr.

52.   On information and belief, McM charged McMartin Sr. a below-market price for the custom farm work done for McMartin Sr., and on information and belief even those charges have not been paid in full for custom work done to date for McMartin Sr.

53.   On information and belief, McM made transfers to McMartin Sr. in the form of below-market, uncollected custom farming services without receiving a reasonably equivalent value in return, all to the detriment of the Bank.

54.   As part of this arrangement with McMartin Sr., and after representing to the Bank the acres and acreage on which McM had planted its own crops with proceeds of the Bank's

loans, McM claimed that McM and McMartin Sr. "swapped fields" in order to permit McMartin Sr. to be paid sooner, all to the detriment of the Bank.

55. McM, through or as directed by McMartin Jr., made the foregoing false representations deceptively, knowingly, or in a manner not warranted by the information known by McM and McMartin Jr., and/or intentionally suppressed information known by McM and McMartin Jr., or made promises without intending to perform them.

56. Upon information and belief, in the fall of 2016, McM and/or McMartin Jr. received proceeds of the Bank's Collateral related to McM's beet crops, Border Beets' beet crops, and McM's interests in the Beets Partnerships which McM and McMartin Jr. did not turn over to the Bank and/or directed to itself rather than to the Bank. McM and/or McMartin Jr. then used or transferred such proceeds without the Bank's permission, contrary to provisions of the Loan Documents and applicable law. All actions regarding these Collateral proceeds were done by McMartin Jr. and/or McM through or as directed by McMartin Jr.

57. Upon information and belief, in the fall of 2016, McM continued its pattern of misrepresentation and deceit by requesting that the Bank fund or permit use of its Collateral proceeds for expenses – including payroll – that had already been paid by McM from the misappropriated beet and Beets Partnership Collateral or other sources undisclosed to the Bank. These actions were taken by McM through or as directed by McMartin Jr.

58. In the fall and winter of 2016, McM, through or as directed by McMartin Jr., and McMartin Jr. failed and refused to provide the Bank with information requested by the Bank that would permit the Bank to verify whether the Collateral was used without the Bank's permission or not turned over to the Bank as required by the Loan Documents and applicable law.

**THE ADDITIONAL DEFAULTS**

59.   In addition to the actions described above, McM defaulted on other terms of the Loan Agreement and the other Loan Documents.  Multiple events of default have occurred and are continuing, including but not limited to the following defaults:

(a)   Failure to pay the Revolving Line of Credit, Hedge Line and 2016 Input Loan at their maturity on November 1, 2016.

(b)   Failure to make interest payments on the Revolving Line of Credit, Hedge Line and 2016 Input Loan for the months of August, September, October and November, December and January:

(c)   Failure to comply with the Tangible Net Worth covenant set out in the Loan Agreement (Section 5.6.1), as confirmed by Borrower's Compliance Certificate for the period ending December 31, 2015 (*"Borrower's Compliance Certificate"*);

(d)   Failure to comply with the Fixed Charge Coverage Ratio covenant set out in the Loan Agreement (Section 5.6.2), as confirmed by Borrower's Compliance Certificate;

(e)   Failure to comply with the Fixed Asset Expenditures covenant set out in the Loan Agreement (Section 5.6.3), as confirmed by Borrower's Compliance Certificate;

(f)   Failure to comply with the Working Capital covenant set out in the Loan Agreement (Section 5.6.4), as confirmed by Borrower's Compliance Certificate;

(g)   Failure to comply with the Real Estate Lease Notices and Limitations covenant set out in the Loan Agreement (Section 5.6.11), as confirmed by Borrower's Compliance Certificate;

(h)   Failure to comply with the Limitation on Other Lease Obligations covenant set out in the Loan Agreement (Section 5.6.12), as confirmed by Borrower's Compliance Certificate;

(i)    Violation of Section 4.3 of the Loan Agreement, in which McM certifies to the Bank that financial statements, information and other data furnished by McM and McMartin Jr. to the Bank "are complete and correct in all material respects and disclose all contingent obligations which are material individually and in the aggregate.  Such financial statements accurately and fairly represent each applicable party's financial condition and operating results as of such date and since such date there has been no material change in Borrower's or any of the Guarantors' financial condition or results of operations sufficient to materially impair the ability to repay the Loan";

(j)    Violation of Section 5.8 of the Loan Agreement, pursuant to which McM agreed that "Borrower shall deliver to Lender or shall cause Guarantors and Third-Party Pledgors to deliver to Lender such additional information concerning the financial condition of Borrower, Guarantors, and Third-Party Pledgors as Lender may reasonably request from time to time.  All financial statements to be provided pursuant to this Section shall be prepared in accordance with generally accepted accounting principles. Borrower shall maintain proper and accurate books and records relating to its operations and business affairs";

(k)    Violation of Section 7.1.3 of the Loan Agreement, which defines an event of default to include "[a]ny representation or warranty made by Borrower, any of the Third-Party Pledgors, or any of the Guarantors in the Loan Documents or as part of the Loan or in any certificate or document furnished as part of the Loan shall prove untrue in any material respect on the date as of which they were made or as of the date on which they were to be effective; or any financial statement or financial information delivered pursuant to this Loan Agreement is false or misleading in any material respect as of the date thereof"; and

(l)    Violation of Section 5.a. of the Fourth Amendment and Section 5.a. of the Fifth Amendment, pursuant to each of which Borrower made the following representation and warranty:

> Borrower hereby agrees with, reaffirms, and acknowledges all representations and warranties contained in the Loan Agreement and the Loan Documents (except that certain Events of Default existed as of December 31, 2015 as a result of certain covenant violations by Borrower).  Furthermore, Borrower hereby represents and warrants that all representations and warranties of Borrower made in any of the Loan Agreement and the Loan Documents are true and correct in all respects as of the [Fourth/Fifth] Amendment Closing Date to the same extent and with the same effect as if made at and as of the date thereof and further acknowledge and agree that all representations and warranties of Borrower made in any of the Loan Agreement and the Loan Documents will continue to be true and in full force and effect. In addition, Borrower hereby represents, warrants and covenants that all information, including without limitation the financial information, disclosure, projection, prediction, forward looking statement regarding Borrower and/or the business operations of Borrowers (the *"Financial Statements"*), provided by Borrower to Lender in connection herewith or to induce this [Fourth/Fifth] Amendment fairly and accurately represent and will fairly and accurately represent, in all material respects, the financial conditions of Borrower, and the results of the operations of Borrower as of the date of the Financial Statements and as of the date projected or predicted in the Financial Statements.

60.    The Bank delivered to McM and McMartin Jr. notices of default dated May 24, 2016, July 25, 2016 and September 27, 2016, copies of which are attached hereto and incorporated herein by reference as **Exhibit 21**.

61.    As of January 30, 2017, the following principal amounts are due under the following loans, plus accrued and accruing interest, fees, costs and expenses:

|     |                          |              |
|-----|--------------------------|--------------|
| (a) | Revolving Line of Credit | $32,000,000  |
| (b) | Hedge Line               | $1,414,700   |
| (c) | 2016 Input Loan          | $8,793,000   |
|     | **TOTAL PRINCIPAL**      | **$42,207,700** |

## COUNT I:  APPOINTMENT OF A RECEIVER

62.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 61 as if fully set forth herein.

63.     As indicated in the foregoing allegations of the Complaint, the Bank has valid claims against McM and McMartin Jr. for amounts due under the Loan Documents.

64.     The Bank is also a secured creditor with respect to the personal property owned by McM and McMartin Jr., which stands as Collateral for their obligations to the Bank.

65.     Defendants have engaged in a pattern and practice of misrepresentation in order to obtain the extension or continuation of substantial credit and loans from the Bank.

66.     Defendants have purposely concealed information from the Bank in order to obtain the extension or continuation of substantial credit and loans from the Bank.

67.     McM has made transfers to others without receiving a reasonably equivalent value in return.

68.     McM has diverted loan proceeds to uses not allowed, and subjected the Collateral to claims by other creditors for liens and encumbrances as a result of its violation of the Loan Documents.  Some of those creditors may attempt to exercise and have already exercised setoff or other alleged rights against the Collateral, thus diminishing the value of the Collateral to the Bank, and the Bank's rights.

69.     The Collateral is in imminent danger of being concealed, diminished in value, squandered or misappropriated by McM and McMartin Jr.

70.     The Bank is owed in excess of $42 million by McM and McMartin Jr.  It appears that other creditors of McM are owed in excess of $10 million.

71.     McM's assets are located in Minnesota and North Dakota.

72.    Unless a receiver is appointed to take possession of the McM Collateral, the McM Collateral is in imminent danger of losing value and being misappropriated before the process of collection, foreclosure and orderly liquidation can be concluded.

73.    A receiver with the power to sell the assets free and clear of liens and other claims, with liens and claims attaching to the proceeds of sale pending resolution of those liens and claims, can liquidate the McM Collateral in an expeditious manner fair to those who make claims in the property, which can be sorted out in an orderly fashion by the Court.

74.    The Bank seeks appointment of a receiver over the McM Collateral for the benefit of the Bank, with protections for other potential secured creditors, pursuant to Fed. R. Civ. P. 66 and 28 U.S.C. §§ 754, 959 and 1692.

### COUNT II:  MONEY JUDGMENT AGAINST McM, INC. ON THE NOTES AND LOAN DOCUMENTS

75.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 74 as if fully set forth herein.

76.    As a result of McM's defaults under the Loan Documents, the Bank is entitled to and has declared the entire unpaid principal balance due under the Loan Documents immediately due and payable, together with accrued and unpaid interest.

77.    As a result of McM's defaults under the Loan Documents, the Bank is entitled to recover from McM its costs and expenses, including attorneys' fees, related in any manner to the loans and the enforcement of the Bank's rights and remedies pursuant to the Loan Documents.

### COUNT III:  MONEY JUDGMENT AGAINST RONALD G. MCMARTIN, JR. ON THE MCMARTIN GUARANTY

78.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 77 as if fully set forth herein.

79.    As a result of McM's defaults under the Loan Documents, the Bank is entitled to and has declared the entire unpaid principal balance due under the Loan Documents immediately due and payable, together with accrued and unpaid interest.

80.    Under the McMartin Jr. Guaranty, McMartin Jr. absolutely and unconditionally guarantees the payment and performance of McM under the Loan Documents.

81.    Under the McMartin Jr. Guaranty, the Bank is entitled to recover from McMartin Jr. its costs and expenses, including attorneys' fees, in connection with the enforcement of the Guaranty.

## COUNT IV:  CONVERSION

82.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 81 as if fully set forth herein.

83.    McM wrongfully took or detained personal property constituting the Collateral, or exercised dominion over the Collateral inconsistent with or in defiance of the rights of the Bank, such that the Bank was wrongfully deprived of its Collateral.

84.    As a result of McM's conversion, the Bank is entitled to turnover of the wrongfully detained property or to recover from McM the value of the Collateral converted.

## COUNT V:  FRAUD AND DECEIT

85.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 84 as if fully set forth herein.

86.    McM and McMartin Jr. deceived the Bank with the intent to induce the Bank to provide or to continue to provide loans and credit facilities to McM by, among other things, providing false financial statements to the Bank, misrepresenting the acreage farmed by McM, misrepresenting how the loan proceeds provided by the Bank would be used, and

misrepresenting the existence of obligations for funding by the Bank or the Collateral which had already been paid.

87.    As a result of McM's and McMartin Jr.'s fraud and deceit, the Bank is entitled to recover from McM and from McMartin Jr., damages in an amount to be determined.

## COUNT VI:  REPLEVIN OF THE COLLATERAL

88.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 87 as if fully set forth herein.

89.    If no receiver is appointed, the Bank seeks relief including, but not limited to, enforcement of its rights in the Collateral, including immediate possession of the Collateral, and the right to sell, lease or otherwise dispose of any or all of the Collateral, and an order directing the Defendants to assemble the Collateral and make it available to the Bank at a reasonably convenient place to be designated by the Bank, and an order that proceeds of Collateral in which another creditor claims a lien or security interest be escrowed pending a stipulation of all claiming a lien or security interest or a further court order.

WHEREFORE, BMO Harris Bank N.A. respectfully requests that this Court:

(a)    Enter an order appointing a receiver over the assets of McM, Inc., and for the administration of those assets pursuant to Fed. R. Civ. P. 66 and 28 U.S.C. §§ 754, 959 and 1692; and

(b)    Enter judgment in favor of BMO Harris Bank N.A. and against McM, Inc. for the amounts owed under the Loan Documents; and

(c)    Enter judgment in favor of BMO Harris Bank N.A. and against Ronald G. McMartin, Jr. for the amounts owed under the McMartin Guaranty; and

(d)    Enter an order requiring turnover of wrongfully detained Collateral to BMO Harris Bank N.A. or enter judgment in favor of BMO Harris Bank N.A. and against

McM, Inc. and/or Ronald G. McMartin, Jr. for the value of the Collateral converted by each of them, respectively; and

(e)   Enter judgment in favor of BMO Harris Bank N.A. and against McM, Inc. for damages resulting from its fraud and deceit, in an amount to be determined; and

(f)   Enter judgment in favor of BMO Harris Bank N.A. and against Ronald G. McMartin, Jr. for damages resulting from its fraud and deceit, in an amount to be determined; and

(g)   If no receiver is appointed, then enter an order for enforcement of its rights in the Collateral, including immediate possession of the Collateral, and the right to sell, lease or otherwise dispose of any or all of the Collateral, an order directing the Defendants to assemble the Collateral and make it available to the Bank at a reasonably convenient place to be designated by the Bank, and an order that proceeds of Collateral in which another creditor claims a lien or security interest be escrowed pending a stipulation of all claiming a lien or security interest or a further court order; and

(h)   Grant such other and further relief as the Court deems just and equitable.

Dated this 1st day of February, 2017.

BMO HARRIS BANK, N.A.


By: /s/ Thomas J. Lallier

Thomas J. Lallier
FOLEY & MANSFIELD P.L.L.P.
250 Marquette Avenue, Suite 1200
Minneapolis, MN  55401
Phone:  612-338-8788
Fax:  612-338-8690
Email:  tlallier@foleymansfield.com

David T.B. Audley
Michael T. Benz
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, IL  60603-4080
Phone: 312.845.3000
Fax: 312.516.3971
Email: audley@chapman.com
benz@chapman.com